733 S.E.2d 107

Andrew P. **BALLARD**, Respondent,

v.

Tim **ROBERSON**, Rick Thoennes, Rick Thoennes, III, and Warpath Development, Inc., Appellants.

No. 27161.

Supreme Court of South Carolina.

Heard Feb. 7, 2012.

Decided Aug. 29, 2012.

Rehearing Denied Oct. 31, 2012.

Joshua L. Howard, of Haynsworth Sinkler Boyd, of Greenville, for Appellants.

Wallace K. Lightsey, of Wyche Burgess Freeman & Parham, and Hannah Rogers Metcalfe, of Metcalfe and Atkinson, both of Greenville, for Respondent.

Justice HEARN.

Relationships in business, like any other relationship, can quickly turn sour when they are predicated on unmet expectations, whether justified or not. Andrew Ballard worked for years crafting a plan for a marina through Warpath Development, Inc., the business he had incorporated for this very purpose. He eventually sought the investment and involvement of Tim Roberson, Rick Thoennes, Rick Thoennes, III (collectively, individual Appellants) to help realize this idea. When the marina did not develop the way the individual Appellants had hoped, they began to exclude Ballard from involvement with Warpath, leading Ballard to file suit against the individual Appellants and Warpath (collectively, Appellants). The circuit court found Appellants had acted oppressively to Ballard as a minority shareholder and ordered the purchase of Ballard's stock at fair market value. The court also ordered the individual Appellants to place 60,000 shares of Warpath stock in escrow. On appeal, Appellants argue that the facts do not support the court's holdings. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Ballard incorporated Warpath for the development of a marina on Lake Keowee in Pickens County, South Carolina. After several years of working with Duke Energy Carolinas, LLC, which owned the lakefront property, Warpath entered into a lease with Duke to use the property as indicated on the Conceptual Plan Ballard had negotiated with Duke.

Subsequently, Ballard began talks with the individual Appellants about their possible involvement with Warpath, and eventually the four men entered into a Stock Purchase Agreement. At that time, the corporation had issued only 40,000 shares of stock, all of which were owned by Ballard, although the Articles of Incorporation authorized the issuance of 100,-000 total shares. Under the Agreement, the individual Appellants paid Ballard $1,000,000 "in exchange for 20,000 shares of Ballard's 40,000 and [received] from the corporation [60,000]

additional shares so that Ballard [would] hold 20% of the stock and the other 80% [would] be held by Roberson, Thoennes and Thoennes III when all shares are finally issued.[1]"

The Agreement also detailed the duties of each of the parties: Ballard was to enter into a separate agreement with Warpath outlining his duties, to include securing certain permits, leases, and services; Thoennes and Thoennes, III were to enter into an agreement defining their duties regarding development work, assistance with proformas and obtaining permanent financing, and executing loan documents; and Roberson was to provide the necessary capital to obtain long term financing. The Agreement also acknowledged Ballard had already obtained a lease from Duke and approvals from Duke and Pickens County, but it stated final permits were still pending.

Incorporated into the lease with Duke was the Plan for the marina. The Plan included general numbers for certain details, including a projected number of 100–200 boat slips. The individual Appellants had reviewed the Plan and the proposed numbers prior to signing the agreement and knew that it guaranteed no more than 100 slips. A few months after the parties entered into the Agreement, they met with Duke and discovered that boat slips were available only on a portion of the anticipated area, which meant the architect could only squeeze in 102 slips, not the maximum of 200.

Upset over this decrease in the projected income due to significantly fewer slips than they had hoped for, the individual Appellants collaborated in drafting an e-mail to convince Ballard to return some or all the money that he had been paid, or to return his 20,000 shares to the corporation and cease involvement with the development. They eventually sent Ballard an e-mail asking that he return the $1,000,000 they had paid him in full or at least return a portion of it if he wanted to move forward. Ballard declined both of those options, and he subsequently was removed as a director at the first shareholders' meeting a few months later. At that same meeting, however, all three of the other shareholders were elected to

---

1. The 60,000 shares of stock from Warpath were issued directly to Roberson, Thoennes, and Thoennes, III immediately after the Agreement was signed.

the board and appointed as officers. Immediately thereafter, the individual Appellants—with the dissent of Ballard—approved the issuance of an additional 900,000 shares "for the purpose of raising capital, paying expenses and offering employee incentives." This issuance would be in direct conflict with the Articles of Incorporation, which only authorized 100,000 shares and the Agreement, which stated Ballard would ultimately own 20% of the corporation. No motion was made to amend the Articles.

Realizing this increase in shares would dilute his holdings to 2%, Ballard initiated this lawsuit, alleging a violation of the Agreement and seeking an injunction preventing the issuance of the additional stock. In response, Appellants counterclaimed for fraud, breach of contract, breach of contract accompanied by a fraudulent act, and promissory estoppel. After discovery, Ballard amended his complaint to include shareholder derivative claims that the individual Appellants had breached the Agreement with respect to duties owed to Warpath and allegations of oppression of the minority shareholder. Appellants then amended their answer and counterclaimed for fraud, breach of contract, breach of contract accompanied by a fraudulent act, negligent misrepresentation, and violation of South Carolina Code Section 35–1–501 (Supp. 2011) in connection with the sale of securities.[2]

A jury trial commenced, but the jury was discharged when Appellants dismissed their counterclaims with prejudice. Thus, only Ballard's equitable claims remained. The circuit court[3] found sufficient evidence of oppression and ordered Appellants to purchase Ballard's stock at fair market value. Additionally, the court ordered that the individual Appellants place 60,000 of their shares in escrow pursuant to Section 33–

---

2. Within a few weeks of filing their amended answer and counterclaims, a shareholders meeting was held at which Ballard was elected a director at the motion of the individual Appellants, but no meeting of directors has been called since. While there apparently have been some discussions with Ballard regarding the permits, he has not received any updates from the directors about efforts to finance the company.

3. Since 2007, Judge Miller has been designated by the Chief Justice as one of three business court judges in this State.

6–210(e) of the South Carolina Code (2006). This appeal followed.

## STANDARD OF REVIEW

"A shareholders derivative action, as well as an action for stockholder oppression, is one in equity." *Straight v. Goss*, 383 S.C. 180, 191, 678 S.E.2d 443, 449 (Ct.App.2009). Therefore, we may find facts according to our own view of the preponderance of the evidence. *S.C. Dept. of Transp, v. Horry Cnty.*, 391 S.C. 76, 81, 705 S.E.2d 21, 24 (2011). However, this broad scope does not relieve the appellant of his burden to show that the trial court erred in its findings. *Pinckney v. Warren*, 344 S.C. 382, 387–88, 544 S.E.2d 620, 623 (2001). Furthermore, we are not required to disregard the findings of the trial judge, who was in a better position to determine the credibility of the witnesses. *Id.* at 387, 544 S.E.2d at 622.

## ISSUES PRESENTED

I.  Did the circuit court err in finding that Appellants had acted oppressively and with unfair prejudice to Ballard?

II. Did the circuit court err in requiring the individual Appellants to place 60,000 shares of Warpath stock into escrow?

## LAW/ANALYSIS

### I. EVIDENCE OF OPPRESSION

Appellants first contend there is insufficient evidence to support the circuit court's finding that they acted oppressively and ordering the purchase of Ballard's stock at fair market value. We disagree.

Section 33–14–300(2)(ii) of the South Carolina Code (2006) allows the circuit court to dissolve a corporation if a shareholder has established that "the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial either to the corporation or to any shareholder (whether in his capacity as a shareholder, director, or officer of the corporation)." In an action to dissolve a corporation on the grounds

stated in section 33–14–300, a court may instead order the corporation or other shareholders to purchase the shares of any shareholder at fair market value. S.C.Code. Ann. § 33–14–310(d)(4) (2006).

In *Kiriakides v. Atlas Food Systems & Services, Inc.*, 343 S.C. 587, 541 S.E.2d 257 (2001), we established how a court should determine whether majority shareholders have acted oppressively within the meaning of section 33–14–300. *Kiriakides* involved Atlas Food Systems and Services, Inc., a family owned close corporation, where the oldest brother, Alex, was the majority shareholder owning 57.68% of the shares. *Id.* at 591, 541 S.E.2d at 260. His siblings John and Louise, the plaintiffs in the case, owned 37.7% and 37.7% and 3% of the corporation, respectively. *Id.* John and Louise brought a lawsuit against Alex and the corporation seeking, among other things, judicial dissolution for oppression. *Id.* at 593, 541 S.E.2d at 261. In establishing the proper considerations for finding oppression, we observed that "the terms 'oppressive' and 'unfairly prejudicial' are elastic terms whose meaning varies with the circumstances presented in a particular case." *Id.* at 602, 541 S.E.2d at 266. We also noted this was a fact-sensitive review and should therefore be determined through a "case-by-case analysis, supplemented by various factors which may be indicative of oppressive behavior." *Id.* at 603, 541 S.E.2d at 266. Although we declined to set out specific factors in *Kiriakides*, we observed several commonly considered ones including: "eliminating minority shareholders from directorate and excluding them from employment[,] . . . failure to enforce contracts for the benefit of the corporation[, and] withholding information from minority shareholders." *Id.* at 605 n. 28, 541 S.E.2d at 267 n. 28.

Examining the facts of the case, we found it "present[ed] a classic situation of minority 'freeze out' " and noted several factors including Alex paying Louise less than was owed to her based on her ownership; Alex's conduct in transferring 21% of a wholly owned subsidiary to his children instead of to a partnership which included John and Louise; Alex and his family receiving substantial benefits from ownership of the company through employment while Louise and John had no such expectations of benefit; Atlas having no intention of declaring dividends in the near future; Atlas's extremely low

buyout options for John and Louise, offering them $4,000,000 in 1998 when John had been told by an accountant in 1995 that his interest alone was worth $10,000,000; and there being no market otherwise for John and Louise's stock. *Id.* at 605–06, 541 S.E.2d at 268.

We acknowledge that the facts before us are not as egregious as those in *Kiriakides,* which included actual fraud by Alex upon the minority. However, illegal or fraudulent conduct is not required under section 33–14–300(2)(ii), and we agree with the circuit court that the evidence in the record shows oppression by the majority in this instance. The concern and focus in shareholder oppression cases is that the minority "faces a trapped investment and an indefinite exclusion [from] participation in business returns." *Id.* at 604, 541 S.E.2d at 267 (quoting Douglas K. Moll, *Shareholder Oppression in Close Corporations: The Unanswered Question of Perspective,* 53 Vand. L.Rev. 749, 790–91 (2000)). Ballard here, like John and Louise in *Kiriakides,* similarly faces prospects of exclusion from the business, a slim chance of seeing a return any time soon, and no market in which to otherwise unload his investment.

In particular, e-mail communications between the other shareholders clearly indicate their desire to oust Ballard. The individual Appellants wanted to convince Ballard to return his 20% interest in Warpath in the hopes that "he [would] take his [$1,000,000] and run [ ] after a little threatening, posturing and whining." Furthermore, when discussing what options to give Ballard, Thoennes, III posited, "Don't we want to get him out of the deal?" Although at trial the individual Appellants sought to downplay the implications of these electronic exchanges, this enunciation of their intent to force out Ballard simply contextualizes their subsequent actions.

Ballard, who had conceptualized this project and had been the sole shareholder as well as a director and officer of Warpath, was not elected to the board although the three individual Appellants were elected and subsequently appointed themselves officers. Furthermore, the individual Appellants then passed a corporate resolution authorizing 900,000 new shares of stock in violation of both the Agreement and the Articles of Incorporation. Issuance of this additional stock

would result in the dilution of Ballard's ownership interest in violation of the Agreement—from 20% to 2%. Although the individual appellants deride the implication of this increase by noting that this dilution would affect all the shareholders with equal force, this contention ignores the larger problems with the resolution. Issuance of this additional stock is in direct conflict with the Articles, which have never been amended [4] to allow such an increase, and is contrary to the agreed upon allocations of the Agreement. Additionally, this issuance would allow Roberson to avoid his contractual obligation to provide the needed capital under the Agreement because the first reason listed for this issuance was "for the purpose of raising additional capital."

This increase also permitted the corporation to use the extra stock for "employee incentives," granting the majority more control over the allocation of benefits flowing from the corporation. There seems to be no plan to hire Ballard as an employee, and at trial Roberson stated his clear intention to hire various members of his family to assist in the enterprise.[5] Thus, Roberson would allow his own family to profit from his ownership—through both salary and, under the new resolution, stock incentives—while not affording Ballard similar benefits. This result is especially significant because returns on investment in close corporations often accrue incident to employment with the corporation as opposed to through dividends. *See* Moll, *supra,* at 758 (noting that "the close corporation investor typically looks to salary rather than dividends for a share of the business returns because the earnings of a

---

4. Although James Fayssoux, who served as the attorney for the corporation, stated in his deposition that amending the Articles was implicit at the meeting, he admitted no resolution had been passed authorizing the filing of the paperwork necessary to amend the Articles.

5. Although Appellants sought to dismiss this consideration as hypothetical, Roberson stated at trial that after spending time at the lake with his niece and her family, he decided her husband was "the guy [he] want[s] running this thing" and "asked them if they would consider the job as on-site managers." He further testified making that decision "attracted ... [his] whole family basically" including his eighty-nine year old mother, his older sister, and his younger sister, who moved to the area "to be a part of what's happening." It thus appears Roberson's decision to hire his family was more than "gross speculation," as claimed in Appellants' brief.

close corporation often are distributed in major part in salaries, bonuses and retirement benefits" (internal quotation omitted)). By increasing the amount of shares, the majority would be allowed further means through which to dictate and control the allocation of returns in favor of their own interests, and to the exclusion of Ballard's.

Moreover, Ballard has not been allowed to meaningfully participate in the development for lack of communication. Appellants admit they have not directly kept him updated on the progress of the permits although Ballard has attempted to stay informed on the status of the permits by maintaining contact with Duke, the engineers, and the Department of Health and Environmental Control. While Appellants contend they elected him as a director in an attempt to include him again, Thoennes admitted at trial that they have not had a directors' meeting since Ballard's election nor have they sent him any updates on financing.

■ We find the record evinces a clear intent by Appellants to "freeze-out" Ballard and exclude him from involvement with Warpath and from the benefits of ownership.[6] Although we acknowledge some harm alleged is arguably prospective, the statute envisions future harm, providing that a court can find oppression where the majority "will act" in a manner oppressive to the minority. Moreover, Ballard should not be prejudiced because he has sought to proactively protect his legal rights and did not wait for the complete evisceration of his involvement once he understood the Appellants meant to force him out of the corporation.[7] We therefore affirm the circuit

---

6. In the dissent's view of the facts, no one action by Appellants is so egregious as to warrant a finding of oppression. We, however, agree with the circuit court judge, that the evidence as a whole clearly demonstrates oppression by the majority.

7. The dissent would have us require a showing of "imminent harm" to obtain relief under section 33–14–300(2)(ii) for future oppression. While we agree with the dissent that our analysis must be undertaken with caution, we see no need to impose a further requirement of "imminent harm" on minority shareholders seeking to protect their rights. Appellants have not asked us to engraft this requirement onto section 33–14–300(2)(ii), and the statute itself contains no such prerequisite.

court's finding of oppression and its requirement that Appellants purchase Ballard's stock at fair market value.

## II. ESCROW OF STOCK

The individual Appellants also argue the circuit court erred in requiring them to place 60,000 shares of Warpath stock in escrow pursuant to section 33–6–210(e). We disagree.

■ Section 33–6–210(e) requires that "the corporation must place in escrow shares issued for a contract for future services or benefits or for a promissory note." Although the individual Appellants argue that Ballard should have requested the shares be placed in escrow at the time the agreement was entered into, the language of the statute is a clear mandate to the corporation to escrow stock when shares have been issued in anticipation of future services. *See Edwards v. State Law Enforcement Div.*, 395 S.C. 571, 575, 720 S.E.2d 462, 464 (2011) ("When a statute's terms are clear and unambiguous on their face, there is no room for statutory construction and a court must apply the statute according to its literal meaning."). However, the individual Appellants aver that the $1,000,000 which they paid Ballard pursuant to the Agreement was in exchange for not only the 20,000 shares owned by Ballard, but also for the remaining 60,000 shares issued by the corporation. We agree with the circuit court that the weight of the evidence and the Agreement itself are directly contrary to this assertion.

■ The agreement states that Roberson, Thoennes, and Thoennes, III would pay Ballard "the sum of $1,000,000 in exchange for 20,000 shares of Ballard's 40,000 and [would] receive from the corporation additional shares." "Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009). Looking simply at the language of the agreement, it states the money tendered is "in exchange for the 20,000 shares" and the shares from the corporation are separate. Furthermore, the $1,000,000 was paid to Ballard directly and not the corporation. Although the individual Appellants argue that it would make sense to pay Ballard money owed to the corporation because he was the sole shareholder at the time, this entirely

ignores the corporate form and the fact that the yet unissued 60,000 shares came directly from the corporation, not Ballard. Because the individual Appellants issued the check to Ballard, the corporation did not receive any money in exchange for the stock. Furthermore, the Agreement itself illustrates the "future services or benefits" that each party would perform by requiring the execution of separate agreements defining the respective duties of the parties.

Read as a whole, the language of the Agreement therefore indicates that the money exchanged was for the 20,000 shares previously held by Ballard and the remaining 60,000 shares were exchanged in anticipation of the services listed. Additionally, because we give great deference to the credibility determinations of the circuit court, we find it compelling that despite conflicting testimony,[8] the court determined that the money had been paid solely for the 20,000 shares directly from Ballard and the corporation had not otherwise been compensated for its issuance of the remaining 60,000 shares. We therefore find no error in the circuit court's finding that the individual Appellants must place 60,000 shares in escrow in accordance with section 33–6–210(e).

## CONCLUSION

Based on the foregoing, we affirm the circuit court's order directing Appellants to purchase Ballard's stock for fair market value and requiring the individual Appellants to place 60,000 shares of stock in escrow.

BEATTY and KITTREDGE, JJ., concur. PLEICONES, J., dissenting in a separate opinion in which TOAL, C.J., concurs.

---

**8.** This inconsistency existed not just between Appellants and Respondent, but even between the individual Appellants. At trial, when Thoennes was asked "[Y]ou [and your son] didn't buy those forty thousand shares when you paid Andy Ballard a million dollars. You've still got to earn them, right?" he responded simply, "Sure." However, his son testified, "In my opinion we were giving him a million dollars for eighty percent of the corporation."

Justice PLEICONES.

I respectfully dissent. In my view, no oppressive conduct toward a minority shareholder has occurred in this case, and the possibility of future oppression is too remote to justify an equitable remedy.

Pursuant to S.C.Code Ann. § 33–14–300(2)(ii) (2006), dissolution of a corporation is appropriate when a court determines that "the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial ... to any shareholder." In applying this statute, courts must exercise caution in finding conduct to be oppressive. *Kiriakides v. Atlas Food Systems & Services, Inc.,* 343 S.C. 587, 597–98, 541 S.E.2d 257, 263 (2001) (quoting official comment that "[t]he court should be cautious in the application of these grounds so as to limit them to genuine abuse...."). Although the statute permits dissolution when those in control *will act* in an oppressive manner, such a finding must be made as cautiously as a finding of past oppression. Thus, I would limit the application of the statute to instances in which the probability of future abuse is a near certainty. That is, a showing of imminent harm must be made. In my view, the evidence in this case fails to establish that oppression has occurred or is imminent.

I agree with the majority that a court-mandated buyout may be appropriate when a minority shareholder "faces a trapped investment and an indefinite exclusion [from] participation in business *returns.*" *Kiriakides* at 604, 541 S.E.2d at 267 (citation omitted; emphasis added). In my view, however, the evidence does not demonstrate that Ballard has been or is in imminent danger of being excluded from *returns,* despite his exclusion from *management.*

Engaging in a power struggle for control of a corporation is permissible if acceptable tactics are employed in the struggle. *Id.* at 598, 541 S.E.2d at 263. By the same token, transferring management of a venture from one shareholder to another is not oppressive if based on a valid business reason. *See also Cooke v. Fresh Exp. Foods Corp., Inc.,* 169 Or.App. 101, 110, 7 P.3d 717, 722 (Or.App.2000) ("Courts give significant deference to the majority's judgment in the business decisions that

it makes, at least if the decisions appear to be genuine business decisions."). In this case, although Appellants were disgruntled with Ballard and removed him as manager of the project, it is undisputed that the project remains in the developmental stage. The likelihood is small that any investor will see a return on investment in the near future. Ballard does not argue that Appellants are seeking to liquidate the corporation's assets or transfer them to other entities. Thus, I do not understand how the majority finds evidence of oppression in the fact that Ballard is unlikely to see a return on his investment in the near future.

The majority also finds that the stock authorization was intended as a means for Roberson to avoid his contractual obligation to provide long-term financing. I do not agree that Roberson's obligation to obtain long-term financing was a commitment to provide all capital needed by the corporation, and it is axiomatic that a corporation may authorize and issue stock for the purpose of raising additional capital. Moreover, in my view the Agreement in this case did not prohibit such action but rather established what the initial stock distribution would be among the various investors.

I also do not find significant the board's failure to amend the articles of incorporation when it authorized the additional shares. This action did not violate the articles, which specified the number of *issued* shares rather than the number of *authorized* shares. Moreover, in my view the absence of a specific amendment to the articles of incorporation is no more than a technicality when the same votes that authorized the shares would also have amended the articles.

The majority reasons that Appellants' intent was to gain greater control over allocation of returns on the parties' joint investment. However, as the majority shareholders, Appellants already had full control of the corporation and its distribution of profits and benefits. Thus, the question is not whether the majority shareholders were seeking control but whether they would have abused or did abuse that control. *See Kiriakides, supra.*

I also do not find it significant that the majority shareholders failed to communicate information to Ballard since, by the time it could be fairly said they should have communicated

financial information to him, Ballard had filed suit against them. Nor would I imply that a minority shareholder is entitled to be apprised of every detail of a firm's operations, even in a closely held corporation. In my view, Ballard has not shown that he was deprived of information he needed to protect his interests as a shareholder. *See Masinter v. WEB-CO Co.*, 164 W.Va. 241, 256–57, 262 S.E.2d 433, 443 (W.Va. 1980) ("The fact that [the minority shareholder] received diminished financial information after his removal as a director and officer may reflect nothing more than the practical recognition that an officer-director needs more financial information, in order to intelligently exercise his responsibilities, than does a shareholder. On the other hand, upon a fuller factual development, the withholding of information may be linked to the 'freeze-out' in that it may have denied him relevant information.").

Likewise, I do not find evidence of oppression in the fact that one of the Appellants planned to employ several family members at the marina. Not only would the planned marina require the services of several employees, but Ballard does not contend that he wished to be employed or have his own family members employed in the operation. Thus, there is no reason to conclude that Appellants intended to deprive Ballard of a benefit he expected. On the contrary, the evidence in the record indicates that Ballard intended to participate only in the development of the project and subsequent returns on investment. Thus, any plans by Appellants to employ family members would be entirely appropriate in the absence of excessive compensation to them.

In sum, although evidence in this case may point to the possibility of oppressive intent by Appellants, it is far from conclusive in establishing that such an eventuality would have become a reality. In my view, this evidence falls well short of the standard articulated in *Kiriakides*. Thus, I respectfully dissent.

TOAL, C.J., concurs.