**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Andrew P. Ballard, Respondent,

v.

Tim Roberson, Rick Thoennes, Rick Thoennes III, and Warpath Development, Inc., Appellants.

Appellate Case No. 2013-002790

———————————

Appeal From Greenville County
Edward W. Miller, Circuit Court Judge

———————————

Unpublished Opinion No. 2015-UP-364
Heard May 7, 2015 – Filed July 15, 2015
Withdrawn, Substituted and Refiled August 26, 2015

———————————

**AFFIRMED AS MODIFIED**

———————————

Joshua L. Howard, Haynsworth Sinkler Boyd, PA, of Greenville, for Appellants.

Wallace K. Lightsey, Wyche Law Firm, of Greenville, for Respondent.

———————————

**PER CURIAM:** Tim Roberson, Rick Thoennes, and Rick Thoennes III— majority shareholders of Warpath Development, Inc.—and Warpath appeal the

circuit court's order determining the fair value of Andrew P. Ballard's ownership interest in Warpath.  We affirm as modified.

## I.  Facts and Procedural History

In *Ballard v. Roberson*, 399 S.C. 588, 597-98, 733 S.E.2d 107, 112 (2012), the supreme court affirmed the circuit court's earlier order finding the individual appellants engaged in shareholder oppression toward Warpath's minority shareholder, Ballard, and ordering all appellants to buy Ballard's stock at fair value. The supreme court's opinion provides a detailed explanation of the facts relating to shareholder oppression.  *See* 399 S.C. at 590-93, 733 S.E.2d at 108-09; *see generally* S.C. Code Ann. § 33-14-300(2)(ii) (2006) ("The circuit courts may dissolve a corporation . . . in a proceeding by a shareholder if it is established that . . . the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial either to the corporation or to any shareholder (whether in his capacity as a shareholder, director, or officer of the corporation) . . . .").  The facts important to the valuation of Ballard's stock are set out below.

Ballard incorporated Warpath for the purpose of developing a marina on Lake Keowee on property owned by Duke Energy Carolinas, LLC.  399 S.C. at 590, 733 S.E.2d at 108.  Warpath's articles of incorporation authorized the issuance of 100,000 shares, and Warpath issued 40,000 shares to Ballard.  *Id.*  After Ballard leased property from Duke and obtained approvals from Duke and Pickens County to build the marina in accordance with Warpath's conceptual plans, he and the individual appellants entered into a stock purchase agreement.  399 S.C. at 590-91, 733 S.E.2d at 108.  The agreement provided the individual appellants would pay Ballard $1,000,000 in exchange for 20,000 of his 40,000 shares of Warpath stock. *Id.*  The agreement also provided Warpath would issue 60,000 shares to the individual appellants, which would result in Ballard owning 20% of the company's stock.  *Id.*  In addition, the agreement provided the duties of each party:

> Ballard was to enter into a separate agreement with Warpath outlining his duties, to include securing certain permits, leases, and services; Thoennes and Thoennes, III were to enter into an agreement defining their duties regarding development work, assistance with proformas and obtaining permanent financing, and executing loan documents; and Roberson was to provide the necessary capital to obtain long term financing.

399 S.C. at 591, 733 S.E.2d at 108.

After the individual appellants became unhappy about a decrease in the projected income of Warpath, they "collaborated in drafting an e-mail to convince Ballard to return some or all the money that he had been paid, or to return his 20,000 shares to the corporation and cease involvement with the development." 399 S.C. at 591, 733 S.E.2d at 108-09. When Ballard refused to agree to a change in ownership structure, the individual appellants elected themselves as directors, removed Ballard from the board, and appointed themselves as officers. 399 S.C. at 591-92, 733 S.E.2d at 109. The board then "approved the issuance of an additional 900,000 shares" of Warpath. 399 S.C. at 592, 733 S.E.2d at 109. The resolution was "in direct conflict with the Articles of Incorporation, which only authorized 100,000 shares[,] and the [Stock Purchase] Agreement, which stated Ballard would ultimately own 20% of the corporation." *Id.*

Ballard filed a lawsuit seeking an injunction against the issuance of new shares and asserting the individual appellants breached their duties to Warpath and engaged in shareholder oppression. *Id.* The circuit court entered an order in 2010 finding Roberson personally paid $1,000,000 to Ballard in exchange for 20,000 of his shares. In addition, the circuit court ruled the 60,000 shares issued to the individual appellants by Warpath were issued "for a contract or contracts for future services" and ordered the shares "must be placed in escrow." *See* S.C. Code Ann. § 33-6-210(e) (2006) (providing a corporation "must place in escrow shares issued for a contract for future services"). The circuit court also found the individual appellants "acted oppressively towards Ballard as the minority shareholder and acted in a way that was unfairly prejudicial to him," and it ordered all appellants to purchase Ballard's shares of Warpath at fair value. The circuit court provided that the value of Ballard's stock would be determined at a subsequent hearing.

The individual appellants and Warpath appealed the 2010 order, and the supreme court affirmed. *See* 399 S.C. at 597-99, 733 S.E.2d at 112-13. The supreme court stated, "We . . . affirm the circuit court's finding of oppression and its requirement that Appellants purchase Ballard's stock at fair market value." 399 S.C. at 597-98, 733 S.E.2d at 112.

On remand, the circuit court found the individual appellants "have still not performed the services for which they received 60,000 shares of stock from the company." The circuit court determined the current ownership structure of Warpath was as follows: Ballard owned 20,000 shares; Roberson owned 40,000

shares, half of which were in escrow; Thoennes owned 20,000 shares, all of which were in escrow; and Thoennes III owned 20,000 shares, all of which were in escrow. The circuit court relied on subsection 33-6-210(e) to determine the shares in escrow should not be counted in calculating Ballard's ownership percentage. The circuit court provided the following explanation:

> The parties' Stock Purchase Agreement was a binding contract in which the individual defendants committed themselves to provide certain elements of value to the company in exchange for the shares of stock issued to them. . . . They have failed to bring the value to the company that they agreed to provide in exchange for their shares. Accordingly, for purposes of assessing the fair value of Mr. Ballard's stock ownership . . . the escrowed shares should not be counted . . . .

Thus, the circuit court found Ballard owned 50% of Warpath—20,000 of the 40,000 shares not in escrow.

Ballard and the individual appellants testified as to the value of Warpath. Ballard testified he believed the value of the company would be $20 million after obtaining the permits necessary to complete the project, and Rick Thoennes conceded he represented in 2011 on a loan application to a potential lender that the company was worth $6 million in its undeveloped state. In 2012, Warpath received an offer from a marina development company to purchase a 70% stake in Warpath for $4.5 million—an offer based on a total value for Warpath of $6.43 million. Ballard called Charles Alford, Ph.D.—an economist—who testified the value of Warpath was between $5,034,969 and $9,286,126. In addition, the circuit court appointed Perry Woodside, Ph.D., to appraise Warpath. Dr. Woodside valued Warpath based on the assumption that construction had not yet begun—but "would begin in 2013"—and determined the fair value of Warpath was $4,366,564. At Ballard's request, Dr. Woodside supplemented his report and explained "the present value of the company would be $7,178,594 if construction of the project had begun in [July] 2010, when the final needed permit was obtained."

The circuit court stated it considered all of the valuation evidence presented, but it concluded $7,178,594—the amount of Dr. Woodside's supplemental report—"is a fair and reasonable estimate of the total economic value of the company." Because the circuit court determined Ballard owned 50% of the stock of Warpath, it calculated the value of his share at $3,589,297. The court ordered "that [the

appellants] pay [Ballard] $3,589,297 within 90 days" and "judgment in this amount is hereby entered for [Ballard] against the [appellants] jointly and severally."

## II.     Law and Analysis

An action for shareholder oppression is one in equity.  399 S.C. at 593, 733 S.E.2d at 109.  "Therefore, we may find facts according to our own view of the preponderance of the evidence."  *Id.*  "However, this broad scope does not relieve the appellant of his burden to show that the trial court erred in its findings. Furthermore, we are not required to disregard the findings of the trial judge, who was in a better position to determine the credibility of the witnesses."  *Id.* (citation omitted).

The primary issue before this court is the value of Ballard's ownership interest in Warpath.  *See* 399 S.C. at 597-98, 599, 733 S.E.2d at 112, 113 (affirming the circuit court's order finding the individual appellants engaged in shareholder oppression and requiring them to place 60,000 shares in escrow and buy out Ballard's shares).  To determine the value of Ballard's interest, we must first calculate the fair value of Warpath.  The court "must undertake to compute the fair value by establishing the fair market value of the corporate property as an established and going business" after considering "[e]very relevant fact and circumstance which enters into the value of the corporate property and which reflects itself in the worth of the corporate stock."  *Santee Oil Co. v. Cox*, 265 S.C. 270, 273, 217 S.E.2d 789, 791 (1975) (internal quotation marks omitted).

We begin our analysis with the circuit court's appointed expert—Dr. Woodside.  In his first report, Dr. Woodside estimated the fair value of Warpath at $4,366,564— correctly assuming construction had not begun.  However, his supplemental report was based on the assumption that construction of the marina began in July 2010. As Dr. Woodside stated in his report,

> If financing and construction had begun in July of 2010,
> as of December 31, 2012, the construction for both
> phases would be completed, phase I net operating income
> would be at approximately 90% stabilization, and phase
> II net operating income would be at approximately 60%
> stabilization.  The equity holders of the company would
> be 2.5 years closer to both receiving the initial cash flow
> to equity and the net proceeds of the expected sale of the

company.  Based on those assumptions, the resulting value of 100% Equity of the Company is $7,178,594 . . . .

Ballard's counsel appropriately conceded during oral argument that a "tension" exists between an assumption that construction began in 2010 for the purpose of valuing Warpath, and the circuit court's finding that the individual appellants did not perform their obligations to make Warpath operational for the purpose of determining Ballard's ownership share.  Because Warpath did not begin financing and construction of the marina in July 2010, an appraisal based on the assumption that it did cannot be correct.  *See Santee Oil*, 265 S.C. at 273-74, 217 S.E.2d at 791 ("Every relevant fact and circumstance which enters into the value of the corporate property and which reflects itself in the worth of the corporate stock must be considered." (citation omitted)).

While we do not accept the figure $7,178,594, we do not reject the testimony of Dr. Woodside.  Rather, we rely on it.  However, we also rely on other evidence in the record, including Thoennes's statement Warpath was worth $6 million, and the offer from the marina development company that contemplated a value for Warpath of $6.43 million.

Finally, we rely on the opinion of Dr. Alford.  Dr. Alford explained he agreed with everything Dr. Woodside did in valuing Warpath, except as to one important variable.  Dr. Woodside assumed a purchaser would insist on a 22% return on investment, and thus Dr. Woodside used 22% as the discount rate on Warpath's cash flow in its future operational state for purposes of valuation.  Dr. Alford explained, however, that a purchaser would likely "leverage" its investment by using borrowed money—in addition to cash—to purchase Warpath.  With this leverage, a purchaser would be able to earn a much higher return on the capital portion of its investment.  Thus, Dr. Alford concluded, a purchaser would accept a smaller return on overall investment in order to attain a return on capital investment in the range Dr. Woodside assumed an investor would require.  Based on these assumptions, Dr. Alford explained an 11.01% discount rate would be appropriate, which resulted in a valuation of $5,034,969 if construction began in 2013, and $9,286,126 if construction began in 2010.[1]

In making the assumption a purchaser would accept an 11.01% return on overall investment, Dr. Alford relied on a December 2012 "Conditional Loan

_____

[1] Dr. Alford provided a report that included the figures $9,268,126 and $12,034,969.  At trial, however, he gave the figures $5,034,969 and $9,286,126.

Commitment" for $24 million "to provide capital for the development of a mixed use project" on the property owned by Warpath. Dr. Alford stated the loan commitment "is highly relevant in a consideration of value" because it "express[es] the interest of a real, identifiable investor within two weeks of the valuation date." Dr. Alford explained the investor who made the commitment "would have itself leveraged its own investment into Warpath, so that, while the *total* return on the project would have been at most 11.01%, the return on [the investor's] *capital*, after meeting its own debt service requirements, would have been higher." Dr. Alford reasoned that if an investor was willing to accept an 11.01% return on its overall investment, as opposed to the 22% return Dr. Woodside assumed an investor would require, a purchaser would be willing to pay more to purchase Warpath—resulting in a higher value than provided by Dr. Woodside.

We have carefully considered all the evidence offered as to the value of Warpath. We find the value of Warpath was not $7,178,594; instead, we hold the fair value of Warpath was $6.25 million.

After determining the fair value of Warpath, we must determine the percentage of shares owned by Ballard. We agree with the circuit court that Ballard owned 50% of the company. A corporation "must place in escrow shares issued for a contract for future services or benefits." § 33-6-210(e). "The shares and distributions escrowed must remain in escrow until the services are performed . . . or the benefits are received. If the services are not performed . . . or the benefits are not received, the shares escrowed . . . may be canceled in whole or in part . . . ." *Id.* The circuit court found 60,000 shares of Warpath remained in escrow because the individual appellants had not performed the services for which the shares were issued, and the supreme court affirmed the decision. *See Ballard*, 399 S.C. at 599, 733 S.E.2d at 112-113. The necessary result of that finding is that the shares in escrow did not count toward ownership for purposes of calculating Ballard's ownership interest. On remand, the parties presented no evidence the individual appellants had taken any steps toward performing the services they promised to perform in exchange for the 60,000 shares. Therefore, we hold the escrowed shares did not count toward ownership for purposes of calculating Ballard's ownership interest, and Ballard owned 50% of Warpath.

The individual appellants also argue the circuit court erred in ordering them to complete the buyout within ninety days and entering judgments against them in the amount of the buyout. The gist of these arguments is that the buyout "failed" because it was impossible for the individual appellants to comply with the ninety-day provision. However, the record contains little evidence regarding the financial

status of the individual appellants, and in particular, contains no financial statements for any appellant. The record actually indicates the buyout did not occur because the appellants chose not to complete it—not because it was impossible. When pressed at oral argument, counsel was careful not to say the individual appellants do not have the ability to comply with the ninety-day provision. Therefore, if a mandatory buyout, instead of a voluntary buyout, is appropriate—a ruling the trial court made in 2010 and the appellants did not appeal—then the imposition of a time limit on the buyout is also appropriate. Without any evidence that the individual appellants cannot comply within the time limit, we find the time limit is appropriate. We also find that if a mandatory buyout is appropriate, then the court must have some way to enforce it. Because appellants did not appeal the mandatory buyout, we decline to hold the circuit court erred in imposing judgments on them to enforce its order.

### III. Conclusion

We find Warpath had a fair value of $6.25 million and Ballard owned 50% of the company. The value of Ballard's share of Warpath, therefore, was $3.125 million. Accordingly, we **AFFIRM AS MODIFIED**.

**FEW, C.J., and HUFF and WILLIAMS, JJ., concur.**