# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

David Wilson, individually and derivatively on behalf of Carolina Custom Converting, LLC, Plaintiff,

v.

John Gandis, Andrea Comeau-Shirley, ZOi Films, LLC, and Carolina Custom Converting, LLC, Defendants,

John Gandis and Andrea Comeau-Shirley, Third-Party Plaintiffs,

v.

Carolina Custom Converting, LLC, Third Party Defendant and Counterclaim Plaintiff,

v.

Dave Wilson, Steve Norvell, Neologic Distribution, Inc. and Fresh Water Systems, Inc.,

Of Whom David Wilson, Neologic Distribution, Inc., and Fresh Water Systems, Inc., are the Respondents,

and

John Gandis, Andrea Comeau-Shirley, and Carolina Custom Converting, LLC, are the Petitioners.

Appellate Case No. 2018-001140

———————

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

———————

Appeal from Greenville County
D. Garrison Hill, Circuit Court Judge

———————

Opinion No. 27980
Heard June 12, 2019 – Filed June 3, 2020

———————

**AFFIRMED AS MODIFIED AND REMANDED**

———————

D. Randle Moody III and John William Sulau, of Jackson Lewis P.C., of Greenville, both for Petitioners Andrea Comeau-Shirley and John Gandis.

Burl F. Williams and Konstantine Peter Diamaduros, of Nexsen Pruet, LLC, of Greenville, both for Petitioner Carolina Custom Converting, LLC.

Bruce Bellinger Campbell, of Horton Law Firm, P.A., of Greenville, for Respondents Fresh Water Systems, Inc. and Neologic Distribution, Inc.

W. Andrew Arnold, of Horton Law Firm, P.A., of Greenville, for Respondent David Wilson.

———————

**JUSTICE JAMES:** We granted a writ of certiorari to review the court of appeals' decision in *Wilson v. Gandis*, Op. No. 2018-UP-078 (S.C. Ct. App. filed Feb. 7, 2018). We affirm as modified the court of appeals' decision as to David Wilson's claim for oppression, we affirm the court of appeals' decision as to John Gandis' and Andrea Comeau-Shirley's claim for breach of fiduciary duty, and we affirm the court of appeals' decision as to Carolina Custom Converting, LLC's claim for misappropriation of trade secrets.

## I.

David Wilson, John Gandis, and Andrea Comeau-Shirley (Shirley) are members of Carolina Custom Converting, LLC (CCC). Wilson, a 45% member, brought an action against Gandis (also a 45% member), Shirley (a 10% member), and CCC alleging they engaged in oppressive conduct against him. Wilson also brought a derivative action against CCC. Relief sought by Wilson included a forced buyout of his membership interest by Gandis, Shirley, and CCC. CCC counterclaimed against Wilson, alleging Wilson misappropriated its trade secrets and communicated these secrets to Neologic Distribution, Inc. and to Fresh Water Systems, Inc.

During a five-day bench trial, the trial court received over three hundred exhibits and heard testimony from ten witnesses. The trial court found Gandis and Shirley engaged in oppressive conduct and ordered them to individually purchase Wilson's distributional interest in CCC for $347,863.23. The trial court found in favor of Wilson on CCC's, Gandis', and Shirley's counterclaim for breach of fiduciary duty.[1] The trial court also found in favor of Wilson, Neologic, and Fresh Water on CCC's trade secrets claim. CCC, Gandis, and Shirley appealed. In an unpublished opinion, the court of appeals affirmed the trial court and adopted the trial court's order in its entirety. *Wilson v. Gandis*, Op. No. 2018-UP-078 (S.C. Ct. App. filed Feb. 7, 2018). CCC, Gandis, and Shirley filed petitions for writs of certiorari to review the court of appeals' decision. We granted their petitions.

## II. STANDARDS OF REVIEW

We must apply different standards of review to the cases before us. CCC is not a corporation but rather is a limited liability company. In the corporate setting, a minority shareholder's action for shareholder oppression is one in equity. *See Pertuis v. Front Roe Rests., Inc.*, 423 S.C. 640, 648, 817 S.E.2d 273, 277 (2018) ("An action for stockholder oppression is one in equity."). We conclude a minority LLC member's action for oppression is likewise an action in equity. This Court reviews "factual findings and legal conclusions in an equitable action de novo." *See Regions Bank v. Wingard Props., Inc.*, 394 S.C. 241, 248, 715 S.E.2d 348, 352 (Ct. App. 2011). "Therefore, we may find facts according to our own view of the preponderance of the evidence." *Ballard v. Roberson*, 399 S.C. 588, 593, 733 S.E.2d

---

[1] CCC appealed from this ruling to the court of appeals; however, CCC did not argue the issue of breach of fiduciary duty in its brief to this Court.

107, 109 (2012). "However, this broad scope of review does not require [this Court] to disregard the findings below or ignore the fact that the trial judge [was] in the better position to assess the credibility of the witnesses." *Pinckney v. Warren*, 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001). In addition, a petitioner is not relieved of its burden of convincing this Court that the trial court committed error in its findings. *Id.* at 387-88, 544 S.E.2d at 623.

CCC seeks money damages from Wilson, Neologic, and Fresh Water under the South Carolina Trade Secrets Act.[2] Under subsection 39-8-40(A) of the Trade Secrets Act, a complainant is entitled to recover actual damages for misappropriation of its trade secrets. Under subsection 39-8-50(A), the complainant may also obtain injunctive relief for actual or threatened misappropriation of its trade secrets. Whether a trade secret misappropriation action is an action at law or an action in equity depends in part on the relief sought by the complainant. *See LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 192 (S.D.N.Y. 2002) (internal citation omitted) ("Where a plaintiff seeks damages for trade secret misappropriation, rather than equitable relief, the claim is essentially legal in nature. Because [plaintiff] is seeking damages, its misappropriation claim is an action at law. . . ."); *see also Cedar Cove Homeowners Ass'n, Inc. v. DiPietro*, 368 S.C. 254, 258, 628 S.E.2d 284, 286 (Ct. App. 2006) ("The character of an action as legal or equitable depends on the relief sought.").

CCC's action for misappropriation of trade secrets is an action at law. "In an action at law tried without a jury, an appellate court's scope of review extends merely to the correction of errors of law." *Temple v. Tec-Fab, Inc.*, 381 S.C. 597, 599-600, 675 S.E.2d 414, 415 (2009). "The Court will not disturb the trial court's findings unless they are found to be without evidence that reasonably supports those findings." *Id.* at 600, 675 S.E.2d at 415. Of course, we review de novo the trial court's legal conclusions in an action at law. *See id.* at 599-600, 675 S.E.2d at 415.

As to Gandis' and Shirley's petition, we affirm the court of appeals as modified. We find Wilson has proven that Gandis and Shirley engaged in oppressive conduct against him. We find Wilson is entitled to a buyout of his interest in CCC, and we agree with the trial court's valuation of Wilson's distributional interest. However, we modify the trial court's order to make CCC liable for the purchase of Wilson's interest in the first instance, with Gandis and Shirley being secondarily liable for the purchase, in proportion to their respective membership interests in

---

[2] S.C. Code Ann. §§ 39-8-10 to -130 (Supp. 2019) (hereinafter, the Trade Secrets Act).

CCC. We remand this issue to the trial court for further proceedings consistent with this opinion. We also affirm the court of appeals as to Gandis' and Shirley's counterclaim for breach of fiduciary duty.

As to CCC's petition, we hold the evidence in the record supports the trial court's conclusion that CCC failed to prove its trade secret misappropriation claim against Wilson, Neologic, and Fresh Water. Therefore, we affirm the court of appeals' holding in the trade secrets case.

## III. FACTS

Gandis, Shirley, and CCC maintain the evidence supports none of the trial court's dispositive factual findings, and they likewise contend the trial court's dispositive conclusions of law are entirely erroneous. Wilson, Neologic, and Fresh Water maintain the trial court's factual and legal findings are unassailable. In the following recitation of our factual findings relative to the oppression claim, we will not undertake to set forth every point of disagreement asserted by Gandis, Shirley, and CCC.

In November 2007, Wilson and Gandis formed CCC, a manager-managed limited liability company, with each man owning a 50% membership interest. Gandis served as president and manager, and Wilson served as vice-president. Wilson and Gandis never executed a formal operating agreement for CCC, but many of their oral agreements were memorialized through email correspondence and on a questionnaire they completed with the intent to create an operating agreement. Wilson and Gandis signed no noncompete, nondisclosure, or non-solicitation of employee(s) agreements.

When CCC was formed, Wilson owned and operated Eastern Film Solutions (EFS), which bought and sold polyester, plastic, and metalized films. Gandis owned and operated DecoTex, which bought and sold decorative designs for vinyl film. Wilson and Gandis initially agreed that CCC would perforate and slit film. Wilson agreed to run some of EFS's slitting business through CCC.

In 2008, Wilson and Gandis discussed expanding CCC's scope of operations and winding down their individual businesses. They discussed EFS buying film from CCC and selling it as an additional source of income to CCC. Wilson also agreed to make CCC the buyer and seller of film for one of EFS's major accounts, Minova, resulting in significant additional revenues for CCC. The Minova account prompted additional discussions between Gandis and Wilson about EFS winding

down and running all new film business through CCC. However, Wilson advised Gandis he intended to keep three import accounts separate from CCC, namely Modular Metal, West Carrollton, and a portion of J.P. Lamborn. After CCC's expansion, Wilson led CCC's sales efforts, and Gandis managed its operations. By July 2009, Wilson completed the year-long process of winding down EFS.

In exchange for transferring EFS's accounts to CCC, Wilson received $8,000 per month. Wilson and Gandis later agreed to increase this to $12,000 per month. Gandis continued to own and operate DecoTex, and he agreed to fund CCC through credit lines from DecoTex and his other business, M-Tech. In addition, Gandis and Wilson both received distributions from CCC. CCC operated out of a building owned by M-Tech; since Gandis owned M-Tech, he received the benefit of rent payments made by CCC to M-Tech.

In 2008, Gandis engaged Shirley, a certified public accountant licensed in Georgia, to provide CCC with accounting and formation advice. In 2009, Gandis and Wilson each transferred a 5% interest in CCC to Shirley in exchange for her services. Shirley did not have a formal voting interest; however, she took an active role in managing CCC. Shirley provided extensive personal counsel to Gandis about his operation of CCC. Gandis and Shirley largely excluded Wilson from their discussions about CCC's business operations. As we will discuss, Gandis and Shirley exchanged a myriad of emails about the operation of CCC, and these emails provide evidence of their oppressive conduct against Wilson.

CCC's business grew, and with the help of a film shortage in the industry, CCC posted a profit of over one million dollars in 2010. Since CCC is a limited liability company, its members have income tax liability proportionate to their membership interests. From the time CCC was formed in 2007 and through 2010, CCC reserved funds for the members to cover their individual tax liabilities. However, CCC had an operating loss in 2011. The high profits from 2010 combined with excess inventory created phantom income for the members, and the leaner revenue from 2011 resulted in a shortfall for the planned 2010 tax distributions.

Gandis had previously procured a line of credit for M-Tech, one of his other businesses. CCC typically relied upon the line to help even out cash flow and to purchase inventory. In private emails to Gandis in early 2011, Shirley urged Gandis to use funds set aside by CCC for its members' 2010 tax liability to pay off CCC's obligation on the M-Tech line of credit. These reserved tax funds were typically kept on hand by CCC and distributed to members to cover their income tax liability. In one early 2011 email to Gandis, Shirley stated, "What I want to do is to keep the

cash balance [of CCC] relatively low . . . so we don't get a request around tax time [from Wilson] to 'distribute' any extra money . . . instead . . . it will already have been used to repay debt. Which is a better use!" (ellipses in original). She then advised Gandis to use the M-Tech line of credit to pay his own taxes, which Gandis did. On April 15, 2011, Shirley told Wilson by email that no distributions would be made to CCC members to cover tax liability.

Trial testimony and emails between Shirley and Gandis from early 2011 reveal their plan to use CCC's employees to perform tasks for Gandis' other businesses, M-Tech and DecoTex. Also, Shirley and Gandis began secretly monitoring Wilson's emails. Shirley sent an email to Gandis in March 2011 telling Gandis that she contacted a CCC employee "to get the name of the software . . . the more we act like nothing special is going on . . . the less likely they are to think that something unusual is going on . . . . The same stuff that protects the business ALSO helps protect the other goals." (ellipses in original). Gandis testified he and Shirley were not secretly monitoring Wilson's emails but were simply collecting all of CCC's incoming emails into an archive so customer quotes and other information would be available for future reference. We agree with the trial court that this testimony was not credible.

Gandis also testified Wilson received notice from CCC's employee handbook that emails were subject to review. However, an employee handbook had never been issued. The record contains an affidavit signed by Gandis with a draft copy of the never-issued handbook attached; the draft provides in pertinent part, "There is no personal privacy in any matter created, received, or sent from the E-mail system. [CCC], in its discretion, reserves the right to monitor and to access any matter created, received, or sent from the E-mail system." Since the handbook was never issued to Wilson or anyone else employed by CCC, Gandis' contention that CCC had the right to monitor Wilson's emails is completely without evidentiary support.

On September 19, 2011, Gandis retrieved a September 12, 2011 email sent to Wilson by Wilson's wife. We agree with the trial court's conclusion that, "[f]rom this point forward, the emails between Gandis and Shirley evidence an effort to exclude Wilson from the benefits of ownership and to cease paying [Wilson] his monthly income as part of an effort to 'squeeze' [Wilson] to relinquish his ownership interest." In the September 12 email to Wilson from his wife, Wilson's wife referenced Wilson hanging up on her during a telephone conversation and also expressed her frustration about Shirley's and Gandis' operation of CCC.

Adding to Gandis' credibility problems was his initial testimony that he did not recall reading any emails between Wilson and Wilson's wife. When confronted with the September 12 email during trial, Gandis testified Wilson's wife should not have emailed her husband at his company email address if she considered the email to be private. Gandis admitted he forwarded the indisputably private email to Shirley with the comment, "I just want you to know what I know so that when the time comes . . . ?" (ellipsis in original). Shirley responded to Gandis that the email demonstrated marital discord, and she advised Gandis of a possible way to take advantage of the situation:

> This is probably your opportunity to make a RESTRUCTURING offer to [Wilson] under which you restructure your relationship with him so that he gives up his equity ownership and converts to a structure where he is only [ ] taxed on what he receives!
>
> . . . .
>
> Now is the time to see if he wants to be in a different structure . . . we can restructure so that he is not an owner as of 1/1/[2012] . . . and you can put him into a different deal that compensates him for his time and energy – maybe more like a regional sales manager is paid – so he gets paid on his sales and also on the sales of the team.

(most ellipses in the original).

The next morning, Shirley sent Gandis an even more detailed email expanding on her previous advice to restructure Wilson's position with CCC. In that email, Shirley referenced Wilson's wife and directed Gandis on the tactics he should employ in getting Wilson to agree to restructure his relationship with CCC, with the obvious goal of Wilson divesting his membership in CCC and becoming an employee with a noncompete agreement. She then presented a framework that reflected the ultimate goal of Wilson becoming a salaried employee on terms that would allow CCC to terminate him for the smallest of reasons and with a noncompete agreement standing in his way to other employment. Even though Wilson held a 45% interest in CCC, Shirley admonished Gandis that Wilson "cannot continue to have access to the financial records" of CCC.

On September 21, 2011, Wilson sent Gandis an email asking for a meeting with Gandis and Shirley. Wilson expressed his interest in knowing what "the game plan is for cash flow and taxes." Gandis forwarded the email to Shirley with the comment, "Now maybe the panic[] is setting in." Shirley responded to Gandis with, among other things, her recommendation that Gandis continue to push Wilson toward relinquishing his membership interest and becoming an employee.

In the spring of 2011, Gandis and Shirley began to defer their member distributions, and CCC began to classify Wilson's monthly member distributions as loans from CCC. Wilson testified Gandis had foregone his distributions in the past, and that at the end of the year, CCC would write Gandis a check to "catch things up." Wilson testified he assumed the same would happen for 2011. In early October 2011, on the advice of Shirley, Gandis presented Wilson with two options: (1) surrender his membership interest in CCC in exchange for the satisfaction of his $123,000 loan balance or (2) become an employee of CCC paid on commission. Wilson responded that he believed the value of his membership interest in CCC was over four times more than $123,000, and he countered with three options for Gandis and Shirley to consider: (1) CCC makes regular distributions to the members to cover each of their tax liabilities; (2) Wilson resigns from CCC while maintaining his 45% interest in CCC and competing with CCC; or (3) Wilson resigns and dissociates from CCC, and CCC either purchases his distributional interest or dissolves. In late October 2011, Gandis responded to Wilson with three options: (1) Wilson remains a member but foregoes the agreed-upon monthly compensation; (2) Wilson retires his membership interest, becoming a salaried at-will employee of CCC with a five-year noncompete agreement; or (3) CCC buys out Wilson's interest; however, the buyout would not eliminate Wilson's tax liability for 2010 or 2011. Wilson was required to choose an option by November 21. In November 2011, Shirley extended Wilson's deadline to January 7, 2012. Unbeknownst to Wilson, around this time, Shirley revoked Wilson's authority to make wire transfers. Also, Wilson was removed as a signatory on CCC's bank account, and Gandis remained the only signatory on the account.

As the January 7 deadline approached, Shirley prepared a "Pro-Forma Balance Sheet" to accompany an offer to Wilson to buy his membership interest. However, the balance sheet contained questionable accruals and removed assets that had been listed on previous CCC balance sheets. The balance sheet also devalued Wilson's interest in CCC. Gandis and Shirley indicated they would sell their membership interests at a price based upon this balance sheet; however, their actual offer to Wilson had materially different terms, including a requirement that Shirley be paid

a $100,000 "preference on units" and the requirement that Wilson purchase M-Tech's building, which Shirley previously deemed a "burden."

The parties did not reach an agreement, and Wilson did not receive his $12,000 monthly compensation in January 2012. With Gandis' consent, Wilson approached potential buyers of CCC and provided them with information about CCC's financial status, absent customer names, and subject to a non-disclosure agreement. During this time, Shirley counseled Gandis to be patient and to allow the pressure to build on Wilson. Specifically, in a January 5 email from Shirley to Gandis, with the subject "[Wilson's] Offer Expires? Patience, grasshopper, patience . . .," Shirley advised Gandis to "PLEASE JUST LET THIS SLEEPING DOG LIE." In the same email, Shirley made other statements, such as:

> We need to remember that we don't care if he is a partner or not . . . only he cares, and even then, he really only cares about getting his cash in front of vendors and employees – and we have told him [ ] NO MORE!
>
> . . . .
>
> My first preference is he buys us out at the price we offered him – there is no deadline on that ability. He can make that offer anytime over the next month or so.
>
> My second preference is that we keep him as a partner – but we have to recapitalized [sic] and reorganize the company to continue. I hope he stays as partner . . . . Then we need to increase my equity for my additional participation and then we will increase your equity for the funding you are providing to the company . . . and I can see us ending up in a structure where you are 50% – [Wilson] is 25% and I am 25%. Your new LLC shares have super-voting rights [and] have a PRIORITY at liquidation. My new shares will also have a priority. . . . We get the additional money from you we need to buy this film – we give you the new super-voting shares and we get on with getting on!
>
> The last thing I want is [Wilson] as an employee. First he will never agree to an all commission deal that is right for

our company. He will want a base that is so SAFE he knows he can earn in his sleep; I worry that we will never get a contract with him that is *good for us*! . . .

Once we restructure our partnership – then if [Wilson] wants to make a million bucks – then he is going to have to make you 2 million bucks (as you will own twice the equity that he owns). ALSO – if he is going to make a million – then I will as well. From my perspective – at least as I am working hard to make our company money and to get positioned for growth – I won't be in the position of making [Wilson] rich while I just barely earn my hourly rate for services!

He has already gone 5 days longer than normal without asking for a check! Let's just keep on focus for our operating plan for 2012 and try not to let him be the giant distraction that he was in 2011.

(most ellipses in original) (emphasis added).

In addition to approaching potential buyers of CCC, Wilson discussed potential employment with FILMtech, a competing company, and indicated he was not bound by a noncompete or a non-disclosure agreement. In a January 16 email to FILMtech, Wilson promised to "move as much of the business I manage at CCC to Filmtech as quickly as possible. In addition, I will work to bring prospective business that CCC has been working on or qualifying over the past 3 to 6 months." However, Wilson did not secure employment with FILMtech.

January 17 emails between Gandis and Shirley reveal their decision to terminate Wilson and physically lock him out of his office but at the same time maintain the narrative that Wilson resigned. Gandis emailed Shirley regarding "[p]ossible legal ramifications for firing [Wilson]" and asking "[w]hat words should I use in the termination?" and "[w]hat steps would I have to go through to get the law on site for the termination?" Shirley gave Gandis what she termed a "small pep talk," with the following instructions: (1) to "remember you have already fired other people and that SC has fairly lax employment laws. So you really cannot botch this as long as you keep a professional attitude and you don't say anything that is not necessary"; (2) to tell Wilson that Wilson's attorney contacted their attorney to

inform them he intended to leave CCC; and (3) to not accept an oral offer Wilson previously made.

On January 18, Gandis arrived at CCC's Greenville office with a law enforcement officer and a locksmith and advised Wilson his resignation was accepted. Wilson protested that he had not resigned. The officer did not force Wilson from the premises because Wilson was a co-owner of CCC; however, Wilson eventually left with two laptops, a Blackberry, files, his personal tax returns, and bank statements. The locksmith completed the lock replacement, and the next day, CCC's attorney sent Wilson's attorney a letter demanding that Wilson return CCC's property and instructing that Wilson "not destroy, copy, sell, or use any of this property, including the computer data." In a January 21 email to Gandis, Shirley advised Gandis to "ignore what I said about '[Wilson] resigned'" and to instead take the position that Wilson was locked out because Shirley and Gandis believed him to be competing against CCC.

Immediately after locking Wilson out, Gandis and Shirley terminated Wilson's and his family's health insurance coverage and cell phone service. Gandis and Shirley increased CCC's monthly rent payments to M-Tech (wholly owned by Gandis) from $2,500 to $6,000. They also increased the interest rate on the M-Tech line of credit used by CCC, thereby increasing the return to Gandis.

In July 2012, unbeknownst to Wilson, Gandis and Shirley formed ZOi Films, LLC, in Georgia. ZOi was organized with two members: M-Tech (owned by Gandis) and Major Brain Storms, Inc., a Georgia corporation owned by Shirley. Gandis and Shirley initially claimed ZOi was formed to "rebrand" CCC because, in their judgment, "CCC didn't have the best reputation for quality." Shirley advised Gandis "to consider another Company name to use [other than CCC]. . . . In this manner – we don't need to haggle with [Wilson] about how much of this new stuff is 'his.'" (ellipsis in original). After Wilson discovered Gandis and Shirley had formed ZOi, Gandis and Shirley maintained ZOi was intended to be a wholly-owned subsidiary of CCC; however, they did not explain why they did not let Wilson, their fellow member in CCC, know about ZOi's formation.

Once Wilson was locked out of CCC premises, he began working and selling for Neologic, a competitor of CCC owned by the wife of Steve Norvell, Wilson's brother-in-law. Norvell's wife also partly owns Fresh Water, and Norvell is president of Neologic and Fresh Water. Fresh Water is not in the film industry. Neologic began selling film in 2012, mostly to CCC's customers with whom Wilson

had long-term relationships that predated CCC's existence. In 2013 and 2014, Wilson continued to sell film for Neologic to CCC's customers.

Wilson filed suit against Gandis and Shirley in 2012 and set forth several causes of action. Wilson sued CCC at a later time, and at some point, Neologic, Fresh Water, and Wilson were sued by CCC. Pertinent to this appeal are (1) Wilson's claim against Gandis and Shirley for minority member oppression, (2) Gandis' and Shirley's counterclaim against Wilson for breach of fiduciary duty, and (3) CCC's claim against Wilson, Neologic, and Fresh Water for misappropriation of trade secrets.

## IV. TRIAL COURT'S RULING

Following a five-day bench trial in 2014, the trial court found Gandis and Shirley engaged in oppressive conduct against Wilson and ordered them to individually purchase Wilson's interest in CCC. Specifically, the court found, "This is a classic squeeze-out, and Wilson established by clear and convincing evidence that 'the managers [and] members in control of [CCC] have acted, are acting [and] will act in a manner that is unlawful, oppressive, fraudulent, or unfairly prejudicial to [Wilson].'" (most alterations in original) (quoting S.C. Code Ann. § 33-44-801(4)(e)).

The trial court also found "[t]he record—particularly the remarkable emails between Gandis and Shirley—abounds with evidence of calculated oppression," providing "multiple examples of oppressive and prejudicial actions by Gandis, CCC's manager, and Shirley, who exercised control delegated to her by Gandis, including the management of CCC's financial affairs." The trial court summarized Gandis' and Shirley's following acts as oppressive and unfairly prejudicial: (1) initiating an "Exit Strategy from [Wilson]"; (2) threatening to stop Wilson's agreed-upon and guaranteed monthly payments unless he relinquished his membership interest and became an at-will employee with a noncompete agreement; (3) refusing to make a tax distribution to Wilson while using the money set aside for the distribution to pay off a line of credit so Gandis could borrow against that line to pay his own taxes; (4) monitoring all of Wilson's private emails, including those with his wife, his attorney, and his accountant; (5) withholding Wilson's agreed-upon and guaranteed monthly distributions in January 2012; (6) making representations that Wilson may not receive distributions for two years; (7) managing the money supply to make it appear as if cash was more limited than it was in actuality; (8) continually making unilateral changes, including secretly back-paying rent at a higher rate than agreed upon and transferring assets, e.g., an air conditioner, to Gandis' entities by

expensing such items as rent; (9) limiting Wilson's access to CCC's financial information; (10) removing Wilson from signatory authority on CCC's operating account; (11) removing Wilson's ability to make wire transfers for CCC; (12) excluding Wilson from discussions about CCC's business operations; (13) manipulating the December 2011 "Pro-Forma Balance Sheet" to devalue Wilson's interest in CCC; (14) physically locking Wilson out of his company and refusing to allow him to return; (15) demanding possession of Wilson's laptops and Blackberry; (16) terminating the cell phone plans for Wilson and his family while maintaining coverage for the other members; (17) terminating health insurance coverage for Wilson and his family; and (18) forming ZOi to compete with CCC in order to siphon profits until Wilson caught them.

The trial court found against CCC, Gandis, and Shirley on their breach of fiduciary duty claim against Wilson. The trial court found against CCC on its trade secrets claim against Wilson, Neologic, and Fresh Water. CCC, Gandis, and Shirley filed a joint motion for a new trial or reconsideration under Rule 59(e) of the South Carolina Rules of Civil Procedure. The trial court denied the motion, reaffirming its previous factual findings "based as they were on the court's finding that [Wilson's] testimony was credible on the key issues. [Gandis'] and [Shirley's] testimony lacked credibility in most important respects." The trial court also found "[t]he evidence revealed that [ ] Gandis and [Shirley] deliberately collaborated to oppress [ ] Wilson. Their conduct was unconscionable. They purposely created a toxic business environment with the goal of driving [ ] Wilson out." CCC, Gandis, and Shirley appealed. The court of appeals affirmed the trial court in an unpublished decision and adopted the trial court's order in its entirety. *Wilson v. Gandis*, Op. No. 2018-UP-078 (S.C. Ct. App. filed Feb. 7, 2018). CCC, Gandis, and Shirley filed petitions for writs of certiorari to review the court of appeals' decision. We granted their petitions.

## V.  GANDIS' AND SHIRLEY'S PETITION

### A. Issues

1. Did the trial court err in finding Gandis and Shirley oppressed Wilson; if not, did the trial court err in ordering Gandis and Shirley to personally buy Wilson's distributional interest?

2. Did the trial court err in finding Gandis and Shirley failed to prove Wilson breached a fiduciary duty to them?

3. Did the trial court err in determining the value of Wilson's distributional interest in CCC?

**B. Discussion**

### 1. Member Oppression

"A member or manager may maintain an action against a limited liability company or another member or manager for legal or equitable relief" to enforce his statutory rights under the Uniform Limited Liability Company Act of 1996 (the LLC Act),[3] his rights under an operating agreement, and "the rights that otherwise protect the interests of the member." S.C. Code Ann. § 33-44-410(a). The comment to section 33-44-410 provides there is "broad judicial discretion to fashion appropriate legal remedies." If a member establishes that "the managers or members in control of the company have acted, are acting, or will act in a manner that is unlawful, oppressive, fraudulent, or unfairly prejudicial" to the member, a court may dissolve the limited liability company. S.C. Code Ann. § 33-44-801(4)(e). The comment to this section provides "the court has the discretion to order relief other than the dissolution of the company. Examples include . . . the purchase of the distributional interest of the applicant." S.C. Code Ann. § 33-44-801 cmt.

In establishing the proper considerations for evaluating a claim for oppression in the context of a closely held corporation, we have observed that "the terms 'oppressive' and 'unfairly prejudicial' are elastic terms whose meaning varies with the circumstances presented in a particular case." *Ballard*, 399 S.C. at 594, 733 S.E.2d at 110 (quoting *Kiriakides v. Atlas Food Sys. & Servs., Inc.*, 343 S.C. 587, 602, 541 S.E.2d 257, 266 (2001)). Determining if oppression exists requires "a fact-sensitive review and should therefore be determined through a 'case-by-case analysis, supplemented by various factors which may be indicative of oppressive behavior.'" *Id.* (quoting *Kiriakides*, 343 S.C. at 603, 541 S.E.2d at 266). In order to prove minority oppression, the plaintiff is not required to prove illegal or fraudulent conduct by the majority shareholders. *Id.* at 595, 733 S.E.2d at 110. "The concern and focus in shareholder oppression cases is that the minority 'faces a trapped investment and an indefinite exclusion [from] participation in business returns.'" *Id.* (alteration in original) (quoting *Kiriakides*, 343 S.C. at 604, 541 S.E.2d at 267). We hold these considerations also apply to a claim for oppression made by a minority member of a limited liability company.

---

[3] S.C. Code Ann. §§ 33-44-101 to -1208 (2006 & Supp. 2019).

The phrases "freeze out" or "squeeze out" are often used interchangeably and denote "the use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants." *Kiriakides*, 343 S.C. at 604 n.26, 541 S.E.2d at 267 n.26.

In *Kiriakides*, we held a majority shareholder's conduct in a family-owned close corporation constituted "a classic situation of minority 'freeze out.'" 343 S.C. at 605, 541 S.E.2d at 267. The Kiriakides family owned Atlas Food Systems & Services, Inc. (Atlas), and Alex was the majority shareholder, owning 57.68% of the corporation. His siblings, John and Louise, owned 37.7% and 3% of the corporation, respectively. John and Louise sued Alex and the corporation seeking, *inter alia*, a buyout of their shares because of minority oppression and fraud. We considered the following actions taken by Alex and Atlas and concluded Alex oppressed John and Louise, the minority shareholders: Alex paid Louise based on 271 shares of Atlas stock when she in fact owned 301 shares of stock; Alex transferred 21% of a wholly owned subsidiary to his children instead of to a partnership which included John and Louise; Alex and his family received substantial benefits from their ownership in Atlas, through employment, while Louise and John had no such expectations of benefit; Atlas declared it would not declare dividends in the foreseeable future, even though it had substantial cash and assets and carried little debt; and Atlas's extremely low buyout offers to John and Louise. *Id.* at 605-07, 541 S.E.2d at 267-68.

In *Ballard*, we held the majority shareholders' conduct oppressed the minority shareholder Ballard. 399 S.C. at 597-98, 733 S.E.2d at 112. Ballard incorporated Warpath Development, Inc., to develop a marina. He owned 40,000 shares of Warpath's authorized 100,000 shares of stock. After several years of working with Duke Energy Carolinas, LLC, which owned lakefront property, Warpath entered into a lease with Duke to use its lakefront property. Subsequently, three men paid Ballard $1,000,000 in exchange for 20,000 of Ballard's shares and Warpath's outstanding 60,000 shares. Following this exchange, Ballard held 20% of the stock, and the three men held 80% of the stock.

Incorporated into the lease with Duke was a plan for the marina, which included a projected number of 100 to 200 boat slips. However, it was later determined the marina could only accommodate 102 slips. Upset over the decrease in their projected income because of fewer boat slips, the three men collaborated with each other and sent an email to Ballard in an effort to convince him to return some or all of the $1,000,000, or to return his 20,000 shares to Warpath and cease involvement with the development. They sent Ballard another email asking that he return the $1,000,000 in full or at least return a portion of the money if he wanted to

move forward. Emails between these three shareholders (who constituted the majority) evinced their hope that Ballard "[would] take his [$1,000,000] and run [ ] after a little threatening, posturing and whining." *Id.* at 595, 733 S.E.2d at 111 (alterations in original). One majority shareholder emailed the others and asked, "Don't we want to get him out of the deal?" *Id.*

Ballard declined both options, and the three majority shareholders removed him from Warpath's board of directors. The majority shareholders did not hire Ballard as an employee, and the majority shareholders issued 900,000 new shares of stock in violation of the articles of incorporation, which decreased Ballard's ownership interest from 20% to 2%.

We held the evidence established a clear intent by the majority shareholders to freeze out Ballard and exclude him from involvement with Warpath and from the benefits of ownership. *Id.* at 597, 733 S.E.2d at 112. We reasoned the majority shareholders did not afford Ballard an opportunity to benefit through salary or stock incentives or to participate, meaningfully, in the development because the majority shareholders failed to communicate with him to provide him with updates. We also found email communications between the majority shareholders "clearly indicate their desire to oust Ballard." *Id.* at 595, 733 S.E.2d at 110. We noted, "Although at trial the individual [majority shareholders] sought to downplay the implications of these electronic exchanges, [the] enunciation of their intent to force out Ballard simply contextualizes their subsequent actions." *Id.* at 595, 733 S.E.2d at 111.

The essence of the de novo standard of review is that the appellate court must not simply accept the factual findings of the trial court but instead must diligently review the record to make findings of fact based upon its own review of the preponderance of the evidence. However, the appellate court cannot ignore the crucial reality that the trial court was in a better position to evaluate the credibility of the witnesses who testified during the trial. The logic of this premise, especially in a case such as the one before us, is self-evident. The credibility of witnesses who testified during this five-day trial was especially vital to the trial court's evaluation of all the evidence. As previously noted, the trial court stated its factual findings were based on its conclusion that "[Wilson's] testimony was credible on the key issues. [Gandis'] and [Shirley's] testimony lacked credibility in most important respects." These findings are not a death blow to Gandis' and Shirley's ability to convince this Court to partially or even completely disagree with the trial court's credibility findings. In this case, however, we agree with the trial court's succinct credibility conclusions.

Further, under the de novo standard of review, the aggrieved party bears the burden of establishing the trial court's factual findings are against the weight of the evidence. Here, the trial court's credibility findings necessarily bled into its evaluation of the preponderance of all the evidence. Based on our review of the record, we are compelled to conclude that Gandis and Shirley—and by extension, CCC—have failed to carry their burden of convincing this Court that the trial court committed error in its factual findings relative to Wilson's oppression cause of action.

The trial court characterized Gandis' and Shirley's efforts as a "tightly controlled cabal to oust Mr. Wilson [that] could serve as a script for minority [ ] oppression." We must agree. The record in this case is replete with evidence of "freeze out" machinations on the part of Gandis and Shirley. The emails between Gandis and Shirley reveal their explicit scheme to oust Wilson, and we agree with the trial court that the emails unveil their step-by-step efforts to convert Wilson from a significant owner, with a promised $12,000 monthly compensation, to either a former owner or an employee bound by a noncompete agreement. The emails between Gandis and Shirley prove they calculated each move against Wilson. As the trial court observed, Shirley even posited to Gandis "we will freeze his capital account and provide that he will be paid out ONLY when the LLC has made distributions to you in excess of your guaranteed payment (and your tax liability)," and that "might mean that [Wilson] sits with a frozen capital account until the LLC liquidates (and he will still have a 2010 tax bill that he has to pay)."

Gandis and Shirley surreptitiously reviewed Wilson's email communications with his wife and used information gathered from this review to develop pressure tactics to squeeze out Wilson. They also deprived Wilson of the benefits of ownership when they withheld Wilson's distribution for his tax liability, while indirectly providing for Gandis to meet his tax liability, and when they withheld Wilson's promised monthly compensation beginning in January 2012. The accounts Wilson transferred from EFS to CCC were Wilson's investment in CCC. Wilson made clear to Gandis that he would transfer those accounts to CCC in exchange for monthly compensation because he was forfeiting income he would have received through EFS. By withholding Wilson's compensation, Gandis and Shirley trapped Wilson's investment in CCC.

Gandis and Shirley also prevented Wilson from meaningfully participating in CCC operations by excluding him from many of their communications regarding CCC. Many times, Shirley advised Gandis to withhold important business information, such as financial and LLC formation information from Wilson, despite Wilson being a co-founder and a 45% owner of CCC. Gandis willingly followed

along, as he did Shirley's other orchestrations. When they knew they had Wilson trapped, Gandis and Shirley presented Wilson with unfavorable alternatives for his future with CCC: (1) become an employee with an onerous noncompete, (2) remain an LLC member but forego the monthly compensation he relied upon, (3) accept a low buyout offer, or (4) buy Gandis and Shirley out on undesirable terms.

Also, Shirley and Gandis collaborated to physically lock Wilson out of CCC's premises and denied him access to CCC's financial information until they were compelled by the trial court to produce such information. After ousting Wilson, Gandis and Shirley routed CCC earnings to Gandis through higher rent and higher interests rates on the M-Tech line of credit. We also agree with the trial court's finding that Gandis and Shirley formed ZOi to compete with CCC in order to siphon profits from CCC.

Gandis and Shirley maintain the trial court erred in awarding equitable relief to Wilson despite his unclean hands. The doctrine of unclean hands "precludes a plaintiff from recovering in equity if he acted unfairly in a matter that is the subject of the litigation to the prejudice of the defendant." *Ingram v. Kasey's Assocs.*, 340 S.C. 98, 107 n.2, 531 S.E.2d 287, 292 n.2 (2000). Gandis and Shirley contend Wilson orchestrated a steady stream of side deals that he concealed from them, shared CCC's trade secrets and confidential information with competitors, and destroyed evidence before and during this litigation. We hold Wilson's conduct did not rise to the level complained of by Gandis and Shirley. Therefore, the doctrine of unclean hands does not preclude Wilson's recovery in this case.

Gandis and Shirley also argue their actions were not oppressive because their actions were not motivated by a desire to shut Wilson out of the business, but were rather an attempt to provide Wilson with options that would allow him to remain a member of CCC while satisfying his tax liability. They contend Wilson was not oppressed or frozen out and he did not find himself in a "trapped investment" or suffering "indefinite exclusion from participation in business returns," which are consequences of oppression. Similarly, Gandis and Shirley claim their locking Wilson out of CCC's premises, demanding Wilson return CCC-owned laptops and Blackberry, and terminating Wilson's cell phone service were "efforts to secure CCC's proprietary information against Wilson's attempts to steal it." We disagree.

We reject Gandis' and Shirley's argument that their actions are protected by the business judgment rule, as the rule only applies "absent a showing of a lack of good faith, fraud, self-dealing or unconscionable conduct." *Dockside Ass'n, Inc. v. Detyens*, 294 S.C. 86, 87, 362 S.E.2d 874, 874 (1987). We completely agree with the trial court's conclusion that "[t]he record—particularly the remarkable emails

between Gandis and Shirley—abounds with evidence of calculated oppression." We find Wilson has proven Gandis and Shirley engaged in oppressive conduct against him.

### 2. Buyout of Wilson's Interest

Gandis and Shirley argue the trial court "took the extreme and legally unsupported step of holding [them] personally liable for alleged oppression of another member." Gandis and Shirley argue they acted in good faith and in the ordinary course of their responsibility to protect CCC from Wilson's malfeasance, and they contend subsection 33-44-303(c) of the LLC Act protects LLC members from personal liability for actions taken in the ordinary course of business of the LLC. We agree in general with the latter statement, but we repeat our conclusion that Gandis and Shirley committed acts of "calculated oppression" against Wilson. We note—and agree with—the trial court's description of Gandis' and Shirley's conduct in other quite pointed language: "unconscionable," "brazen but clumsy," "unfairly prejudicial," "deliberately collaborated to oppress," "created a toxic business environment," and "overt scheme." We reject the argument that an LLC member who commits acts of "calculated oppression" against another member has acted in the ordinary course of business of the LLC.

We have recognized "the LLC Act grants broad judicial discretion in fashioning remedies in actions by a member of an LLC against the LLC and/or other members." *Historic Charleston Holdings*, *LLC v. Mallon*, 381 S.C. 417, 428, 673 S.E.2d 448, 454 (2009) (citing S.C. Code Ann. §§ 33-44-410 cmt., -801 cmt.). Importantly, subsection 33-44-410(a) specifically provides that an LLC member may maintain an action against the LLC or another member for legal or equitable relief "to enforce: (1) the member's rights under the operating agreement; (2) the member's rights under [the LLC Act]; and (3) the rights that otherwise protect the interests of the member. . . ." Courts do indeed have the authority under the LLC Act to order either the LLC or the oppressing member(s) to purchase the oppressed member's interest in the LLC.

Even though the trial court ordered Gandis and Shirley to purchase Wilson's interest, in the exercise of our de novo review, we may order the relief we conclude is most equitable under the relevant circumstances. While we conclude Gandis and Shirley personally engaged in the requisite unconscionable and oppressive conduct to entitle Wilson to a buyout of his interest in CCC, we modify the trial court's order requiring Gandis and Shirley to individually purchase Wilson's interest, and we remand this case to the trial court for proceedings consistent with the following instructions. We first order CCC to purchase Wilson's interest in CCC, and Gandis

and Shirley shall be obligated to purchase Wilson's interest only if CCC does not comply with our order that it do so. On remand, the trial court shall conduct a potentially two-step process for the buyout to take place. In the first (and perhaps only) step, CCC will first be responsible for purchasing Wilson's interest. In this case, the trial court issued a post-judgment order requiring CCC, Gandis, and Shirley to post bond or other surety to fund the purchase of Wilson's interest. The trial court noted CCC was required to post the bond "should an appellate court decide that the obligation to pay [Wilson] for his membership interest properly rests with CCC, and the company . . . becomes insolvent or otherwise unable to pay the judgment should it be affirmed." At oral argument, it was confirmed this bond was purchased and remains in place.[4] The bond should ensure compliance with our order that CCC purchase Wilson's interest. If CCC complies with our order that it purchase Wilson's interest, the trial court need not reach the second step of requiring Gandis and Shirley to purchase Wilson's interest.

With the aid of the bond or otherwise, if CCC's purchase of Wilson's interest does not take place within a reasonable time after the remittitur is issued, the trial court shall take the second step and require Gandis and Shirley to complete the buyout in proportion to their respective membership interests in CCC. Even though Shirley owns a 10% interest in CCC and Gandis owns a 45% interest in CCC, the trial court concluded Gandis and Shirley were jointly and severally liable for the entire purchase price. Shirley argues, and Gandis agrees, that her responsibility to purchase any portion of Wilson's interest should be limited to the proportion her interest in CCC bears to the entire obligation to purchase. We agree.[5]

### 3. Breach of Fiduciary Duty

Gandis and Shirley argue the trial court erred in finding for Wilson on their breach of fiduciary duty claim. They allege in their counterclaim that Wilson breached fiduciary duties owed to CCC and to them by (1) usurping CCC's business

---

[4] After the trial court entered its initial order ordering Gandis and Shirley to purchase Wilson's interest, CCC, Gandis and Shirley filed a joint Rule 59(e) motion (authored by counsel for CCC) and argued CCC, not Gandis and Shirley, should be required to purchase Wilson's interest.

[5] We do not foreclose the possibility that an LLC member who acts to oppress another member can be held liable for an amount greater than his or her proportional interest in the LLC.

opportunities with customers from EFS and engaging in secretive side deals; (2) misappropriating CCC's alleged trade secrets and confidential information; and (3) destroying evidence on CCC's laptops and Blackberry.  Wilson argues Gandis and Shirley lack standing to bring the breach of fiduciary claim against him.  We agree with Wilson.

Because CCC would have sustained any financial loss caused by Wilson's purported actions, Gandis and Shirley lack standing to bring a breach of fiduciary duty claim in their individual capacities.[6]  Any loss suffered by Gandis and Shirley would be derivative of the loss suffered by CCC and not separate and distinct from losses suffered by CCC.  *See Hite v. Thomas & Howard Co.*, 305 S.C. 358, 361, 409 S.E.2d 340, 342 (1991), *overruled on other grounds by Huntley v. Young*, 319 S.C. 559, 462 S.E.2d 860 (1995) (internal citations omitted) ("A shareholder may maintain an individual action only if his loss is separate and distinct from that of the corporation.  A shareholder's suit is derivative if the gravamen of his complaint is an injury to the corporation and not to the individual interest of the shareholder.").  Gandis and Shirley were required to bring a fiduciary duty claim derivatively, on behalf of CCC.  On the merits, we find the trial court correctly concluded Wilson did not breach any fiduciary duties owed to Gandis and Shirley.

**4. Valuation of Wilson's Distributional Interest in CCC and Date of Valuation**

Gandis and Shirley claim the trial court erred by valuing Wilson's distributional interest at the time of his departure from CCC and not taking into account that Wilson's subsequent actions negatively impacted CCC's financial situation.  They argue this error resulted in a windfall for Wilson.

Section 33-44-702 outlines the procedure for a court to use when determining the fair value of a member's distributional interest when that interest is to be purchased by the company.  *See* S.C. Code Ann. § 33-44-701(e).  We conclude, as did the trial court, that the same approach should be employed when individual members are ordered to buy the distributional interest.  However, "there is little [ ] authority setting the proper date of valuing a company in a buy out situation." *Hendley v. Lee*, 676 F. Supp. 1317, 1327 (D.S.C. 1987).  "In cases of minority stockholder oppression, the date of ouster seems appropriately used." *Id.*

---

[6] As noted above, CCC did not argue the issue of breach of fiduciary duty in its brief to this Court.

The parties presented expert testimony on CCC's value and the value of Wilson's distributional interest. Wilson's expert, Catherine Stoddard, valued CCC's total equity at $1,018,753 and Wilson's interest at $408,335 as of December 31, 2011. She valued Wilson's interest at $233,776 as of December 31, 2013. Del Bradshaw (the trial court's appointed expert), Stoddard, and Charles Alford (the defense's expert) testified of possible adjustments to the value of CCC due to equipment moving costs, excess inventory, and advances.

The trial court noted CCC, Gandis, and Shirley failed to present evidence of CCC's then-current financial condition. The court found Stoddard's December 31, 2011 valuation credible but applied Alford's three downward adjustments to calculate the value of Wilson's interest as of that date. First, the trial court reduced CCC's $1,018,753 total value by $50,625, which was half the value of CCC's excess inventory. Second, the trial court reduced the value of CCC's equipment by 25% of its fair market value to account for moving costs. These two downward adjustments reduced the company's total value to $884,140.50, with Wilson's 45% interest valued at $397,863.23. The trial court then applied Alford's third adjustment by reducing the value of Wilson's interest by $50,000 for advances he previously received from CCC. Therefore, the trial court determined the fair value of Wilson's distributional interest in CCC was $347,863.23. We agree with the trial court's valuation of Wilson's interest.

Under the facts of this case, we find the most equitable valuation date is December 31, 2011. *See Hendley*, 676 F. Supp. at 1327 ("[T]he ultimate issue [in establishing a proper valuation date] is what is fair between the parties in each case."). First, as noted by the trial court, CCC, Gandis, and Shirley failed to present evidence of CCC's then-current financial condition during the 2014 trial, partly because CCC failed to file tax returns for the 2012 and 2013 tax years. Second, Gandis and Shirley initiated an exit strategy and ousted Wilson in January 2012; therefore, valuing CCC and Wilson's interest in CCC as of December 31, 2011, provides an accurate value of CCC when Wilson was an active member of CCC with an opportunity to impact CCC's financial condition. Conversely, December 31, 2013, is an inappropriate valuation date because from January 2012, when Gandis and Shirley ousted Wilson, until present, Gandis and Shirley have prevented Wilson from participating in any CCC business decisions or operations that impact CCC's value.

# VI. CCC'S PETITION

## A. Issue

Did the trial court err in finding CCC failed to prove its trade secret misappropriation claim against Wilson, Neologic, and Fresh Water?

## B. Discussion

CCC's trade secrets cause of action is based on its contention that it spent significant time, effort, and resources developing its customer and supplier contact lists, electronic vendor reference program, and inventory reference program, all of which CCC claims are its trade secrets. CCC contends Wilson misappropriated these trade secrets when he began working for Neologic. Neologic is CCC's competitor and is owned by the wife of Wilson's brother-in-law and CCC's defendant, Steve Norvell. Norvell's wife also partly owns Fresh Water, and Norvell is president of Neologic and Fresh Water. Fresh Water is not in the film industry; however, CCC claims Wilson, Norvell, and Fresh Water formed Neologic about two months after Wilson left CCC and claims Neologic and Fresh Water have common employees, operate out of the same location, and operate with the same funds—funds CCC claims at least partially derive from CCC's trade secrets.

When Wilson left CCC premises on the day of his ouster, he took with him two CCC-owned laptops and a Blackberry. The laptops contained CCC files and CCC emails that Wilson testified he wanted to have "to prove what happened" to him. The Blackberry contained Wilson's personal information such as bank account numbers, passwords, and his children's social security numbers. He testified he copied CCC files and emails that were on the laptops to his own computer and erased the laptops. He testified he then put the CCC files and emails back on the laptops and returned them to CCC's attorney. Wilson testified he reformatted the Blackberry to erase his and his family's personal information and returned the device to CCC. Wilson testified he used the information he copied from the laptops not to compete with CCC, but solely as evidence in this litigation.

"The first issue to be determined in every trade secret case is . . . whether, in fact, there was a trade secret to be misappropriated." *Lowndes Prods., Inc. v. Brower*, 259 S.C. 322, 327, 191 S.E.2d 761, 764 (1972). Though *Lowndes* was decided before the passage of the Trade Secrets Act, that proposition remains

fundamental. The Trade Secrets Act defines a "trade secret" as information, including a compilation, program, system, process, or procedure that:

> [(a)](i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> (b) A trade secret may consist of a simple fact, item, or procedure, or a series or sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a process or the production of a product, or may be the basis of a marketing or commercial strategy. The collective effect of the items and procedures must be considered in any analysis of whether a trade secret exists and not the general knowledge of each individual item or procedure.

S.C. Code Ann. § 39-8-20(5) (Supp. 2019).

In order to decide "whether something is a trade secret, one must consider the extent to which the information is known outside of his business and the ease or difficulty with which the information could be properly acquired or duplicated by others." *Carolina Chem. Equip., Co. v. Muckenfuss*, 322 S.C. 289, 296, 471 S.E.2d 721, 724 (Ct. App. 1996). In the instant case, the trial court found the information pertaining to pricing, customers, and vendors/suppliers was "publicly accessible" and therefore did not rise to the level of being a trade secret.

There is evidence in the record to support the trial court's finding, as there was evidence presented at trial that the information lacked "independent economic value," as the information was readily ascertainable by proper means by the public or was ascertainable by other persons who could obtain economic value from the use of the information. Mike Myers and Bruce Hotmer, both experienced film brokers, testified vendor/supplier information, pricing information, manufacturer information, and customer information were ascertainable from trade associations, through trade journals, at trade shows, or from other publicly available sources.

Hotmer testified customers of film distributors typically do not sign nondisclosure agreements and are free to share with him what product they are buying, from whom they are buying it, and at what price they are buying it. Hotmer also testified his customers are his primary source of what they are paying other film distributors. He clarified that information as to how manufacturers price their film "[is] not only widely available, it's part of the expectation of your organization of the sales force. It's what you expect." He explained he had been a sales representative, a regional sales representative, and a national sales representative and that "[w]e were expected to know all that information about our customers, and our competitors, and their competitors."

We hold the trial court's finding that the information did not have the required independent economic value is supported by evidence in the record. Therefore, we need not address CCC's remaining arguments pertinent to its trade secrets claim.[7]

## VII. CONCLUSION

As to Wilson's claim for oppression, we hold: (1) Gandis and Shirley engaged in oppressive and unconscionable conduct against Wilson; (2) the trial court properly valued Wilson's 45% distributional interest in CCC at $347,863.23; and (3) Wilson is entitled to a buyout of his distributional interest, and this equitable remedy is not barred by the doctrine of unclean hands. We modify the court of appeals' oppression holding and hold CCC is first obligated to purchase Wilson's interest in CCC. If CCC does not complete the purchase within a reasonable time after the remittitur is sent to the lower court, Gandis and Shirley shall be required to purchase Wilson's interest in proportion to their respective membership interests in CCC.

We affirm the court of appeals as to Gandis' and Shirley's action against Wilson for breach of fiduciary duty.

We also affirm the court of appeals as to CCC's trade secrets claim.

**AFFIRMED AS MODIFIED AND REMANDED.**

**BEATTY, C.J., KITTREDGE, HEARN, and FEW, JJ., concur.**

---

[7] For information to be considered a trade secret, the owner of the information must exercise "efforts that are reasonable under the circumstances to maintain its secrecy." S.C. Code Ann. § 39-8-20(5)(a)(ii). The owner must also prove its damages were proximately caused by misappropriation. The trial court concluded CCC had proven neither of these elements.